**UNITED STATES of America, Appellee,**

v.

**May SPEARS, aka May Jordan, and Edward Jordan, aka Eddie, Appellants.**

**No. 76–1816–17.**

United States Court of Appeals, Tenth Circuit.

Argued Nov. 18, 1977.

Decided Jan. 20, 1978.

Rehearing Denied March 3, 1978.

Don L. Grace, Oklahoma City, Okl., for appellant, May Spears.

Bob G. Carpenter, Oklahoma City, Okl., for appellant, Edward Jordan.

Susie Pritchett, Asst. U. S. Atty., Oklahoma City, Okl. (David L. Russell, U. S. Atty., and Duane Miller, Asst. U. S. Atty., Oklahoma City, Okl., with her on brief), for appellee.

Before SETH, Chief Judge, McWIL-LIAMS and BARRETT, Circuit Judges.

SETH, Chief Judge.

The defendants, May Spears, a/k/a May Jordan, and Edward Jordan appeal from a conviction of violating 18 U.S.C. § 894, by using extortionate means to collect extensions of credit. A jury found the appellants guilty on five counts of making extortionate extensions of credit in violation of 18 U.S.C. § 892, and with four counts of violating 18 U.S.C. § 894. The court entered a judgment notwithstanding the verdict on those counts charging the making of extortionate extensions of credit.

The appellants raise two issues on appeal. The first raises the question whether conviction is barred if all the Government's witnesses deny at trial that any threats were made, or that they were ever put in fear; the second, whether the trial court's ruling permitting the introduction of evidence showing collection practices was improper hearsay and prejudicial to the appellants.

We conclude that there was sufficient evidence to support the jury's verdict relating to 18 U.S.C. § 894, and that the court's ruling admitting Mr. Hastings' testimony concerning the appellants' collection practices in the community was proper.

The statute under which the appellants were convicted prohibits knowing participation in the use of extortionate means to attempt the collection of a debt. "Extortionate means" is defined as:

". . . [A]ny means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7).

The Government's evidence consisted primarily of testimony from persons who had borrowed money from May Jordan; the testimony of several special agents of the Federal Bureau of Investigation who had analyzed the interest rates appellants charged on some of these accounts, and who interviewed witnesses before trial.

The evidence in substance showed that appellant, May Jordan, was in the business of loaning money, and examples of loans were testified to. For example, she loaned $80.00 to Arizona Jackson, and the loan agreement required the borrower to pay back $120.00 in thirty days. When she was

unable to pay, the appellant raised that amount from $120.00 to $180.00, which was to be paid out at $20.00 per month. Another example, Myrtle Hastings borrowed $50.00 from appellant, and was to repay $100.00 in one month. Linda Blaine borrowed money from May Jordan, and testified that the appellant would "whip" her if she didn't pay her debt. She also testified that she had seen May Jordan carry a gun, but that since she paid her debts, there was no reason to be frightened. Donald Hastings borrowed money, and was unable to make payment as agreed upon. He testified that May Jordan said Mr. Hastings could not outrun appellant, or that he could not "whip" her. Mary Allen also borrowed money from the appellants, but was unable to repay it as agreed. Eddie Jordan called upon Miss Allen at her home. She testified that he came inside carrying a shotgun, sat down, placed the shotgun on his lap, and said that he was going to get the money he was owed one way or another.

Of those who borrowed money from May Jordan, only Miss Allen testified at the trial that appellants' reputation in the community was that they "climbed on people," frightening them about receiving their money. With this exception, all witnesses indicated at trial that neither May Jordan nor her brother, Eddie Jordan, ever used extortionate means to collect a debt. Arizona Jackson's testimony was indicative, direct, and to the point:

"Q. Now, you are not telling us that May ever came over and threatened you, did she?

"A. May never threatened me nary a time. I said that in the beginning and I will say it again in the ending, she have never threatened me."

The jury had also the testimony of special agent Errol Myers:

"Q. Mr. Myers, as the agent in charge of this case, you personally went out and took the statements from, I think, every one of the witnesses that testified for the Government, did you not?

"A. I did, with the exception of Linda Blaine, I, I, uh, didn't take that statement myself. Mr. Anderson did.

"Q. Okay. The statements that you did take from every witness but Linda Blaine, did the people give you—when you talked to them, did they tell you the same story as to what occurred as they have testified to here in court?

"A. Yes, they did.

"Q. Were there any changes made at all that you noticed?

"A. They had indicated that they were, that they were in fear at the time that they—borrowing the money, at the time—The only change is that they sort of backed out on us on some of the things that they had originally told us when they got on the stand, as far as actual threats being made to them and actually being in fear and that type of statement, yes.

"Q. Who specifically did these people tell you originally that they were afraid of?

"A. Well, May, Eddie—May and Eddie mostly.  .  .  ."

The appellants claim that the evidence the Government produced was insufficient as a matter of law because "some testimony-in-chief from an alleged victim was essential to prove the necessary element of the crime, the use of extortionate means." There is no controlling authority in the Tenth Circuit on this question. In *United States v. DeLutro*, 435 F.2d 255 (2d Cir.), the court held that a defendant who used extortionate means to collect his debt could still be convicted, even where his victim denied at trial that any threats were made, or that he was ever put in fear. We agree with *DeLutro* and must reject the notion that the silencing of a victim at trial can absolutely eliminate the possibility of a conviction. *See generally United States v. Quintana*, 457 F.2d 874 (10th Cir.). The evidence summarized does not show, with one exception, that any threats of violence for failure to pay debts were made directly to those who borrowed money from the

appellants. The threat of violent consequences comes from the general nature of all the loan and collection transactions, and from defendants' reputation in the community. The testimony of Myrtle Hastings is characteristic:

"Q. Has May ever threatened you personally?

"A. No, she hasn't threatened me at all.

"Q. Has she ever made threats to you about your children and them not paying their debts to her?

"A. She talked about whipping Linda.

"Q. Well, what exactly, who are you talking about now, May?

"A. May, yes.

"Q. What did May say?

"A. Well, she just said she would whip Linda.

"Q. Did she say she would whip Linda?

"A. She said she would whip Linda, she didn't mention Eddie.

"Q. All right. Now, you said that she would whip Linda if what?

"A. If she didn't pay it.

"Q. Under what circumstances was she going to whip Linda? What would have to happen if she was going to whip Linda?

"A. If Linda didn't pay her her money, that she was going to whip Linda.

"Q. Have you ever known May to carry a gun?

"Q. I seen . . . I haven't seen May with a gun but once."

From all the evidence presented below we conclude there was sufficient evidence from which a jury could find that extortionate means were used in an attempt to collect an extension of credit.

■ The defendants contend also that the trial court erred in permitting Mr. Hastings to testify concerning general debt collection practices of the appellants. 18 U.S.C. § 894(c) provides:

"In any prosecution under this section . . . the court may in its discretion allow evidence to be introduced tending to show the reputation of the defendant in any community of which the person against whom the alleged threat was made was a member at the time of the collection or attempt at collection."

Mr. Hastings was questioned concerning the appellants:

"Q. Tell me this, what is the reputation in the community as to their collection practices? People who don't pay them, what happens to them?

"A. Well, I heard, you know, from what I heard on the streets, you know, that if you borrow anything from them, that you'd better pay it or they will come get you.

"Q. Okay. Who's the 'they' that's going to come get you?

"A. Well, once, I heard that Jessie would be one.

"Q. Jessie? Who's Jessie?

"A. This one right here.

"Q. Oh, Jessie sitting right back here in the green—

"A. Shirt.

"Q. —vest, is that him?

"A. Yes.

"Q. Who is Jessie?

"A. Her brother, I think.

"Q. That's May's brother?

"A. May's brother.

"Q. Right.

"A. Yes.

"Q. What's the word on the street Jessie is going to do to you if you don't pay your—pay the money to May and Eddie?

"A. Whip the head, I guess, whip your —."

Appellants urge us to find that admission of such testimony was error. It is, however, our conclusion that the admission of such testimony is well within the confines of 18 U.S.C. § 894(c). It is apparent that there has been no abuse of discretion in applying this standard.

The judgment is AFFIRMED.