UNITED STATES of America, Appellee,

v.

**Willie H. DENNIS, Appellant.**

**No. 79–1278.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 5, 1979.

Decided June 24, 1980.

Rehearing and Rehearing En Banc
Denied July 29, 1980.

Irl B. Baris, St. Louis, Mo., for appellant.

Stephen B. Higgins, Asst. U. S. Atty. (on brief), for appellee; and Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief.

Before GIBSON, Chief Judge,* and LAY and McMILLIAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Willie H. Dennis appeals his conviction[1] on twelve counts of an eighteen-count indictment charging seventeen violations of the Extortionate Credit Transactions Act (ECT), 18 U.S.C. §§ 892, 894 (1976) and one obstruction of justice under 18 U.S.C. § 1503. We affirm.

From September 10, 1962, through October 2, 1978, Dennis was employed by the General Motors Assembly Division in St. Louis, Missouri. Beginning at least as early as 1970, Dennis started lending money to fellow plant workers and others at twenty-five percent a week interest, a practice which he continued until at least March 10, 1978. On Thursday, which is payday for the nightshift employees, Dennis customarily lent to and collected from nightshift employees in the plant cafeteria. On Friday, which is payday for the dayshift employees, Dennis made loans and collections in front of the guard shack at the plant entrance. Occasionally, other individuals made collections on behalf of Dennis; and, when a payment was long overdue, Dennis searched out the debtor at locations away from the plant. Documents taken from Dennis in the contested searches identified his debtors by name, amount of loan, interest paid and interest collected. These records revealed the following facts about Dennis's operation: (1) from December 22, 1977, through March 10, 1978, the total amount collected was $31,777.00, of which $22,701.00 was interest; (2) the usual rate of interest was twenty-five percent a week or thirteen hundred percent a year; and (3) there were 133 accounts as of March 10, 1978, with a total balance outstanding of $52,956.00.

On August 25, 1978, Dennis was named in a four-count grand jury indictment, charging a one-count violation of the Racketeer Influenced and Corrupt Organization Stat-

ute (RICO), 18 U.S.C. § 1962(c); two counts of collections of credit by extortionate means under ECT; and one count of obstruction of justice. On the day the trial was to begin, the court granted both Dennis's motion to dismiss the RICO count and the government's immediate request for a continuance.

During the postponement, the government secured a superseding nineteen-count indictment and later a second superseding indictment. The superseding indictment charged eighteen violations of ECT and one obstruction of justice. The sixteen new counts named additional borrowers.

The jury trial lasted nine days. On motion of the government, one count was dismissed. The jury found Dennis guilty on twelve counts and not guilty on six counts.

I. Searches and Seizures

First, Dennis argues that the trial court erred in admitting evidence seized in searches of his home and person pursuant to warrants, and a warrantless search of his automobile.

In November 1977, the government first became aware of Dennis's money-lending activities. During an interview for a pretrial diversion program whereby he would not be charged with or convicted of an admitted federal felony offense, Thomas Yingling mentioned that he had been borrowing money from Dennis at high interest rates and that Dennis had threatened him in October 1977. On November 22, 1977, the FBI had Yingling engage in a telephone conversation with Dennis about the balance due. The conversation was recorded. On December 9, 1977, the FBI placed a hidden recorder on Yingling's person so that he could again discuss the loan with Dennis.

After surveillance and photographing of Dennis in the interim, the FBI applied on March 9, 1978, for search warrants for Dennis's home and person. The affidavit in

---

* The Honorable Floyd R. Gibson was Chief Judge of the Eighth Circuit at the time this case was submitted and took senior status on December 31, 1979, before the opinion was filed.

1. The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri.

support of the warrants referred to the alleged threat in October and summarized the November 22 telephone conversation. It did not mention the tape-recorded conversation of December 9. Nor did it state that Yingling was in the pretrial diversion program. The warrants were issued, and the searches produced money-lending records, cash, weapons and other items that were admitted into evidence.

At the time that the search warrants for Dennis's house and person were executed, the FBI agents wanted to search Dennis's car but did not have a search warrant for the car. Dennis initially refused them permission to search his car. After the agents told Dennis that they "would get" or "would attempt to get" a warrant to search the car, Dennis gave his consent to the search of the car. Certain paychecks and a pistol were found there and admitted into evidence.

■ Dennis contends that the fruits of the searches of his home and person should be suppressed because the warrants were invalidated by the intentional omission of material facts in the affidavit presented to the magistrate, those facts being the tape-recorded December 9 conversation and Yingling's "criminal record." The affidavit need only show facts sufficient to support a finding of probable cause. *United States v. Fleming*, 566 F.2d 623, 625 (8th Cir. 1977); *United States v. Kershman*, 555 F.2d 198, 201 (8th Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977). Therefore, omissions of other facts would not be misrepresentations unless they cast doubt on the existence of probable cause. Whether or not the December 9 conversation contained threats, the affidavit contained an allegation of an October 1977 threat. Here, if the disputed conversation contained threats, it was merely additional evidence of criminal activity. If not, it did not disprove the alleged earlier threat. In fact, the affidavit could have been adequate without any allegation of an explicit threat. *United States v. Spears*, 568 F.2d 799, 801 (10th Cir.), *cert. denied*, 439 U.S. 839, 99 S.Ct. 127, 58 L.Ed.2d 137 (1978); *United States v. Nakaladski*, 481 F.2d 289, 297–99 (5th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973); *United States v. DeLutro*, 435 F.2d 255 (2d Cir. 1970), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148 (1971).

■ Dennis argues that the magistrate had to be informed of Yingling's "criminal record,"[2] apparently because it would have reflected on his reliability and credibility. However, Yingling was not an unidentified professional informant to whom stringent tests of credibility are applied.[3] Not only was he a non-professional with no motive to falsify,[4] but also he was the victim of the crime. Such an informant's credibility is readily established. *Andreson v. Maryland*, 427 U.S. 463, 478 n.9, 96 S.Ct. 2737, 2747, 49 L.Ed.2d 627 (1976); *United States v. Swihart*, 554 F.2d 264, 268–69 (6th Cir. 1977); *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *McCreary v. Sigler*, 406 F.2d 1264, 1269 (8th Cir.), *cert. denied*, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969). The credibility of an informant may be established by corroboration by the affiant of only parts of an informant's story. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Aguilar v. Texas*, 378 U.S. 108, 114–

---

2. Yingling did not have a criminal record beyond the incident for which he was placed in the pretrial diversion program. That program is restricted in fact to those who don't have "criminal backgrounds" or felony conviction records.

3. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), together require that, with an unidentified, professional informant, the magistrate must be informed of (1) some of the circumstances from which the affiant's conclusion is based, and (2) some of the underlying circumstances from which the affiant concluded that the informant was credible or his information reliable.

4. Yingling's placement in the pretrial diversion program was prior to, and in no way conditioned on, his statement to the FBI that he was being victimized by a loanshark.

15, 84 S.Ct. 1509, 1513–1514, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 382 F.2d 871, 881 (8th Cir. 1967), *rev'd on other grounds*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Each of Yingling's detailed statements to the affiant—except the October 1977 threat—was independently corroborated, as the affidavit alleges. Yingling's credibility was established. It was not necessary to notify the magistrate of his participation in the pretrial diversion program.

Because neither of the omitted facts was material to a finding of probable cause, we need not consider whether their omission was intentional. *Franks v. Delaware, supra*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667.

■ Dennis also attacks the timeliness of the affidavit. The March 9, 1978 affidavit referred to Yingling's initial loan in November 1976. Yingling's statements in November 1977 and January 1978 also related incidents in the fall of 1977. Probable cause must exist at the time the warrant is issued. *United States v. Steeves*, 525 F.2d 33, 37–38 (8th Cir. 1975). If past circumstances would have justified the search, there must be reason to believe that those circumstances still exist at the time of the search. C. Wright & A. Miller, Federal Practice & Procedure § 662, p. 23. If, because of delay in applying for a warrant, the information in the affidavit is stale, probable cause may be diminished. *Andreson v. Maryland, supra*, 427 U.S. at 478 n.9, 96 S.Ct. at 2747. But the delay is not considered separately. The length of the delay is considered together with the nature of the unlawful activity. *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972). And they are considered in the light of common sense. *Id.* Hence, in *United States v. Johnson*, a three-week delay did not undermine probable cause where the illegal distilling was an on-going business, rather than a mere isolated violation. *Id.* In *Andreson v. Maryland*, a three-month delay did not undermine probable cause because the warrants were for business records that were likely to be maintained for a long time. *Supra*, 427 U.S. at 478 n.9, 96 S.Ct. at 2747. Here, the affidavit clearly indicated the continuing nature of Dennis's loansharking operation. It also stated that he had been under photo surveillance and had been observed making collections on March 3, 1978, only six days before the affidavit was offered. There was ample reason to believe that the illegal activity was continuing at the time of the search. Under these circumstances, probable cause was not vitiated by the passage of approximately three months since the last event described by the informant.

■ Dennis next contends that the search warrants were so broad that they constituted general warrants in violation of the fourth amendment. The warrants authorized the seizure of "certain books and records (or items of evidence) relating to the extortionate credit transaction business" and listed items "which constitute evidence relating to violations of Sections 891–94, Title 18, United States Code." Dennis's house and person were very thoroughly searched. The evidence seized was mostly records of the loansharking operation. The degree of specificity required depends on the type of goods to be seized. As this circuit has stated:

> Where the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice because less particularity can be reasonably expected than for goods (such as those stolen) whose exact identity is already known at the time of issuance. [citations omitted]

*United States v. Johnson*, 541 F.2d 1311, 1314 (8th Cir. 1976). The *United States v. Johnson* analysis would permit a lesser degree of particularity for evidence of a loansharking operation, the exact identity of which evidence is not known at the time of issuance. In this situation, "certain books and records relating to the extortionate credit transaction business" was a permissible generic class and set reasonable parameters for the search.

■ Dennis's last contention relating to the searches is that the pistol and cashed

paychecks found in his automobile should have been suppressed because his consent to that search was not voluntary. He argues that he was coerced both by being in custody and by the agents' statements that they would get a search warrant. The test in reviewing a consent search is whether, in the totality of circumstances, the consent is given voluntarily and without coercion. *E. g., United States v. Culp*, 472 F.2d 459 (8th Cir.), *cert. denied*, 411 U.S. 970, 93 S.Ct. 2161, 36 L.Ed.2d 692 (1973). It is well established that custody alone does not make the consent involuntary and coerced. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Further, "where law enforcement officers indicate only that they will attempt to obtain or are getting a warrant such a statement cannot serve to vitiate an otherwise consensual search." *United States v. Culp, supra*, 472 F.2d at 461 n.1 and cases cited therein. Even taken together, these two factors do not make Dennis's consent involuntary under the totality-of-circumstances test. His custody at that time was temporary for the limited purpose of executing the body search. The agents' comments may have led him to believe that, if he did not consent, his car would be searched pursuant to a warrant anyway. That does not necessarily, however, make his consent involuntary. Here, Dennis was advised of his right to object, which he did initially. Then he asked the police questions about the car search. He does not contend that the answers were dishonest. After he was advised that an agent would get or attempt to get a warrant, he changed his mind and consented to the search. The chronology indicates that Dennis knew his rights and gave his consent after careful consideration. Such consent was not involuntary or coerced under the totality of circumstances criteria.

## II. Delay

Dennis was originally charged on August 28, 1978, in a four-count indictment. The first count charged was a violation of RICO, 18 U.S.C. § 1962(c). Counts two and three alleged collection of loans by extortionate means, 18 U.S.C. § 894, naming Marshall and Hughes as victims. The fourth count was an obstruction of justice count, 18 U.S.C. § 1503, as to Hughes. Dennis attacked all counts of the original indictment in his motion to dismiss. The trial court overruled the motion to dismiss on September 12, 1978. On October 19, 1978, the day when trial was set, the trial court reconsidered the motion and dismissed count one. The government requested and was granted a continuance until December 4, 1978, to consider appealing the dismissal of count one. Instead of appealing, on November 16, 1978, the government obtained a superseding indictment from the grand jury. Counts four, eighteen and nineteen of the superseding indictment were the same as counts two, three and four of the original indictment. The sixteen new counts named additional borrowers, several of whom had been named in the dismissed count one of the original indictment. Dennis alleges that the government never considered taking an appeal but merely delayed until it could get a new indictment from the grand jury. Further, he alleges that there was no new evidence and that the purpose of the new indictment was to bring in evidence that was barred by the dismissal of original count one. Therefore, he charges that the forty-six-day continuance violated his fifth amendment due process rights as well as his sixth amendment speedy trial rights, as implemented by 18 U.S.C. § 3161 *et seq.*

Under the Speedy Trial Act, the time limit begins to run with the first indictment. Where the first indictment is dismissed at the defendant's request, the time limitation begins to run anew with reindictment. *United States v. Sebastian*, 428 F.Supp. 967 (W.D.N.Y.), *aff'd*, 562 F.2d 211 (2d Cir. 1977), *aff'd without opinion*, 578 F.2d 1372 (1978). Where the indictment is dismissed on the government's motion, the time limitation is merely tolled during the period when no indictment is outstanding. *Id.* The situation at bar does not fit neatly into either of the above categories. The dismissal followed Dennis's motion, but was

made *sua sponte* by the court after a previous denial. Although the government did request continuance, the first indictment remained outstanding. There is, however, another alternative; the court may toll the running of the time limitation by granting a continuance under 18 U.S.C. § 3161(h)(8)(A) if the ends of justice are served by such action. *United States v. Howard*, 440 F.Supp. 1106 (D.Md. 1977). Here, the trial court dismissed count one *sua sponte*, then immediately granted the government's request for continuance. The real issue is whether the court abused its discretion in determining that the ends of justice served by taking such action outweighed the best interest of the public and the defendant in a speedy trial. After dismissing a principal count of the indictment, allowing the government a short continuance to reassess its case arguably served the ends of justice. There was no abuse of discretion in the court's determination that the ends of justice served by that action outweighed Dennis's interest in a speedy trial. Therefore, the forty-six-day continuance was not a denial of his sixth amendment right to a speedy trial.

▆▆▆▆ An intentional delay to gain a tactical advantage is inherently improper and violates fifth amendment due process rights. *United States v. Marion*, 404 U.S. 307, 324–25, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). The ultimate question in determining whether a deliberate or reckless delay is "tactical" is whether it is engineered to impair the defendant's ability to mount an effective defense by causing him to lose evidence or witnesses. *United States v. Lovasco*, 431 U.S. 783, 795, 97 S.Ct. 2044, 2051, 52 L.Ed.2d 752 (1977). In this circuit, for dismissal of the indictment, the defendant must show both a deliberate delay for tactical advantage and a resulting prejudice. *United States v. Page*, 544 F.2d 982, 984 (8th Cir. 1976), followed in *United States v. Weaver*, 565 F.2d 129, 132 (8th Cir. 1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978); and *Smith v. Mabry*, 564 F.2d 249, 253 (8th Cir. 1977),

*cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978). In the case at bar, neither factor was present. Dennis does not even allege that he was prejudiced as a result of the delay; he did not lose any evidence or witnesses. He does allege that the delay was deliberate, but he does not offer any evidence in support of that allegation. The government, on the other hand, has submitted a sworn affidavit averring that (1) the prosecuting attorney was in communication with the Department of Justice, which originally favored an appeal but subsequently recommended against it, and (2) the superseding indictment was prompted by renewed willingness of the certain victims to testify. *See United States v. Lavasco, supra*, 431 U.S. at 794 n.15, 97 S.Ct. at 2051. These facts negate the bare allegation that it was a deliberate delay for tactical advantage. Therefore, the forty-six-day delay did not violate Dennis's fifth amendment due process rights.

### III. The Turncoat Witness

Third, Dennis objects to the trial court's admission of prior inconsistent statements before the grand jury by complaining witness Charles Miller (count nine) for purposes of impeachment because of confusion of the issues and misleading the jury under Rule 403, Federal Rules of Evidence. Further, he asserts that once the prior inconsistent statements were admitted, the trial court erred in excluding prior consistent statements by Miller for rebuttal under Rule 801(d)(1)(B), Federal Rules of Evidence.

Miller had testified before the grand jury that he had seen Dennis with a gun; that Dennis had lent him money at "25 cents on the dollar"[5] and that Dennis had told him not to tell the grand jury; that he was afraid to go to Dennis's house because he was worried about his family or dying; and that he was afraid to testify against Dennis because, even if Dennis were incarcerated, "there might be somebody else out there that would knock me off." Yet on direct examination at trial, Miller not only denied

---

**5.** This testimony was corroborated by Dennis's own records.

the underlying facts, but also either denied making or claimed not to recall having made the above statements. Often, his denials in court went beyond the questions asked and inadvertently revealed his recollection of his previous testimony. For example, when asked, "Did Willie Dennis charge you interest?", he replied, "No, he haven't. He didn't charge me 25 cents on the dollar. No, he didn't." On cross-examination, excerpts from the first few minutes of Miller's grand jury testimony to the effect that he hadn't been threatened were read, and Miller admitted having made them. Dennis also implied that the grand jury had asked Miller leading questions.

The government prosecutor complained that Miller had changed his testimony at trial and asked permission to impeach him by prior inconsistent statements in the grand jury transcript. The judge noted that Miller was obviously frightened at trial and that the prosecutor had been surprised by his testimony.[6] However, the judge considered Miller's grand jury testimony weak or confused, so he read the transcript himself and determined which portions could be called to the jury's attention. The judge denied Dennis's request to reread some prior consistent statements to the jury on the ground that they were merely cumulative.

■ Generally, courts will not admit an extrajudicial statement, or hearsay, because its accuracy and trustworthiness cannot be tested by confrontation and cross-examination. U.S.Const. Amend. 6. However, Rule 801 provides in pertinent part:

Article VIII. HEARSAY

Rule 801. Definitions

The following definitions apply under this article: . . .

(d) Statements which are not hearsay. A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is

(A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at trial, hearing or other proceeding, or in a deposition, or

(B) consistent with his testimony or is offered to rebut an express or implied charge against him of recent falsification or improper influence or motive . . . . .

■ Statements made before a grand jury are within the Rule 801(d)(1)(A) exception for statements given under oath and subject to the penalty of perjury. *United States v. Mosely*, 555 F.2d 191, 193 (8th Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977). This is so even if the statements were elicited by means of leading questions. *United States v. Champion International Corp.*, 557 F.2d 1270, 1274 (9th Cir.), *cert. denied*, 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977). The trial judge has considerable discretion in determining whether testimony is "inconsistent" with prior statements; inconsistency is not limited to diametrically opposed answers but may be found in evasive answers, inability to recall, silence, or changes of position. *United States v. Rogers*, 549 F.2d 490, 495–96 (8th Cir. 1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). Prior inconsistent statements may be admitted as substantive evidence, *United States v. Mosely, supra*, 555 F.2d at 193. Whether to admit them as substantive evidence or to limit their use to impeachment is within the broad discretion of the trial

**6.** At common law, the party calling a witness at trial could not impeach his credibility unless the party could show both surprise and substantial harm. *Bushaw v. United States*, 353 F.2d 477 (9th Cir. 1965). But Rule 607 of the Federal Rules of Evidence allows impeachment of one's own witness. So long as prior inconsistent statements are otherwise admissible, they may be used for impeachment; and surprise is no longer a prerequisite to their use.

*United States v. Long Soldier*, 562 F.2d 601, 605 (8th Cir. 1977). The prosecution's ability to impeach its witness with prior inconsistent statements is crucial in cases where the "turncoat" witness is afraid, *United States v. Gerry*, 515 F.2d 130, 139–40 (2d Cir. 1975) (loansharking prosecution), or hostile, *United States v. Rogers*, 549 F.2d 490 (8th Cir. 1976) (charged with the same offense).

court. *United States v. Rogers, supra,* 549 F.2d at 498; *United States v. Porter,* 544 F.2d 936, 938 (8th Cir. 1976). However, otherwise inadmissible evidence may not be put before the jury in the guise of impeachment. *United States v. Rogers, supra,* 549 F.2d 490; *Bushaw v. United States,* 353 F.2d 477, 481 (9th Cir. 1965), *cert. denied,* 384 U.S. 921, 86 S.Ct. 1371, 16 L.Ed.2d 441 (1966). Laying the proper foundation for a prior inconsistent statement requires that the witness must be afforded an opportunity to explain or deny the statement and that the opposing party must be afforded an opportunity to interrogate the witness concerning the statement. *Osborne v. United States,* 542 F.2d 1015, 1020 (8th Cir. 1976); *United States v. Martorano,* 457 F.Supp. 803, 811 (D.Mass. 1978) (denial of new trial), *rev'd on other grounds,* 610 F.2d 36 (1st Cir. 1979). Where a witness denies or cannot recall a prior inconsistent statement, that statement may be read to the jury for impeachment. *United States v. Rogers, supra,* 549 F.2d 490. But a witness who admits making a prior inconsistent statement is thereby impeached, and no further testimony is necessary. *United States v. Jones,* 578 F.2d 1332, 1340 (10th Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 284, 58 L.Ed.2d 259 (1978).

■ Miller's grand jury testimony was clearly not hearsay according to the criteria in Rule 801(d)(1)(A). Even if it were elicited by leading questions, it would be admissible. The foundation for the prior inconsistent statements was laid when Miller had the opportunity to explain the apparent contradictions. For example, Miller said that he had not been "afraid" but only "concerned" about the consequences of nonpayment. The trial judge correctly determined that Miller's denials of and inability to recall grand jury testimony were "inconsistent" with his trial testimony. Because Miller denied or could not recall the prior inconsistent statements, reading them to the jury was the proper method of putting them in evidence. Limiting use of the prior inconsistent statements to impeachment was within the trial judge's sound discretion.[7]

■ But Dennis argues that admission, even for that limited purpose, was an error under Rule 403. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Rule 403 is to be interpreted and applied in conjunction with the overall purposes of the Federal Rules of Evidence in Rule 102. Rule 403 "contemplates a flexible scheme of discretionary judgments by trial courts designed to minimize the evidentiary costs of protecting parties from undue prejudice." *United States v. Jackson,* 405 F.Supp. 938, 945 (E.D.N.Y. 1975). In determining whether evidence should have been excluded under Rule 403, a reviewing court must give great deference to the trial judge who saw and heard the evidence. *United States v. Weir,* 575 F.2d 668, 670 (8th Cir. 1978). " 'Unfair prejudice' [under Rule 403] means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note, Rule 403, Fed.R.Evid. quoted in *Depew v. Hanover Insurance Co.,* 438 F.Supp. 358, 360 (E.D.Tenn. 1977). Confusion of the issues warrants exclusion

---

7. The government takes the position that the statements were admissible as substantive evidence because they were nonhearsay under F.R.E. Rule 801(d)(1)(A). Here, the trial judge initially said that the excerpts from the grand jury testimony went to the victim's state of mind but later instructed the jury that they were to be used for impeachment only. Therefore, the substantive evidence issue is not before us. However, we note in passing that this circuit would permit their use as substantive evidence. *United States v. Mosley,* 555 F.2d 191 (8th Cir. 1977). Furthermore, a recent scholarly article argues persuasively that hearsay analysis is inappropriate to the witness fear problem and that admission of prior inconsistent statements is especially probative in loansharking prosecutions. Goldstock & Coenen, *Controlling the Contemporary Loanshark: The Law of Illicit Lending & the Problem of Witness Fear,* 65 Cornell L. Rev. 257–58 (1980).

of relevant evidence if admission of the evidence would lead to litigation of collateral issues. *Seven Provinces Insurance Co. v. Commerce & Industry Insurance Co.*, 65 F.R.D. 674, 689 (W.D.Mo. 1975). Whether to admit cumulative evidence bearing solely on credibility is within the discretion of the trial judge. *United States v. Medical Therapy Sciences, Inc.*, 583 F.2d 36, 41 n.6 (2d Cir. 1978), *cert. denied*, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979). Similarly, whether to admit cumulative evidence for purposes of impeachment is committed to the discretion of the trial judge. *United States v. Dominguez*, 604 F.2d 304, 310 (4th Cir. 1979), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1023, 59 L.Ed.2d 76 (1980). In weighing the probative value of evidence against the dangers and considerations enumerated in Rule 403, the general rule is that the balance should be struck in favor of admission. *United States v. Day*, 591 F.2d 861, 878 (D.C. Cir. 1978), *citing* C. McCormick, Evidence 453 n.55 (2d ed. 1972).

▮ We hold that the trial judge correctly admitted Miller's prior inconsistent statements before the grand jury. Dennis gives no clue as to what collateral issues he feels were injected by their admission. The prior inconsistent statements would have gone directly to the elements of extortionate extension of credit. The judge, however, limited their use to impeachment. Moreover, the trial judge admitted only those prior inconsistent statements which he found reliable. These discretionary judgments by the trial court fulfilled Rule 403's purpose minimizing the evidentiary costs while protecting parties from undue prejudice.

▮ We turn then to whether Dennis had a right to read prior consistent statements made by Miller before the grand jury. After one party opens the subject of prior inconsistent statements, the other party may wish to introduce prior consistent statements to rehabilitate the "turncoat" witness. The extent to which rehabilitative evidence may be received is within the discretion of the trial court. *United States v. Perry*, 550 F.2d 524, 532 (9th Cir.), *cert.*

*denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 228 (1977); *Hanger v. United States*, 398 F.2d 91, 105 (8th Cir. 1968), *cert. denied*, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969). A question about prior consistent statements is proper rehabilitation. *United States v. Rinn*, 586 F.2d 113, 119–20 (9th Cir. 1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979). A prior consistent statement is admissible under Rule 801(d)(1)(B) to rebut a charge that the witness had an improper motive for testifying. *See generally* Annot., 47 A.L.R. Fed. 639, § 8(b) (1980). A request to introduce prior consistent statements is properly granted to the extent that they relate to the same subject matter as prior inconsistent statements used for impeachment. *United States v. Smith*, 328 F.2d 848, 850 (6th Cir.), *cert. denied*, 379 U.S. 936, 85 S.Ct. 336, 13 L.Ed.2d 346 (1964). A prior consistent statement may not be introduced, however, simply to bolster the testimony of the witness at trial. *United States v. Allen*, 579 F.2d 531, 532–33 (9th Cir.), *cert. denied*, 439 U.S. 933, 99 S.Ct. 326, 58 L.Ed.2d 329 (1978). A request to introduce the entire extrajudicial statement is properly denied where all the prior statements related to impeachment had been presented to the jury and the prior consistent statements would be mere repetition. *Coltrane v. United States*, 418 F.2d 1131, 1140 (D.C. Cir. 1969); *Walker v. International Harvester Co.*, 294 F.Supp. 1095, 1098 (W.D.Okla. 1969).

Admission under Rule 801(d)(1)(B) is limited to situations where the prior consistent statements have high probative value. Once the witness admits making a prior consistent statement, no further testimony on that point is necessary. Here, defense counsel read from the grand jury record each of the prior consistent statements, each of which Miller acknowledged having made. Then the prior inconsistent statements had to be read to the jury because Miller denied making them. Rereading the prior consistent statements would have been mere repetition to bolster the witness's trial testimony. All the information relating to Miller's credibility, both his impeachment by prior inconsistent state-

ments and his rehabilitation by prior consistent statements, was before the jury. The trial judge correctly determined that further reading from the grand jury record would have no probative value and hence not be admissible under Rule 801(d)(1)(B).

## IV. Cross-examination re Credibility

Dennis contends that the trial court erred in restricting his cross-examination of a key witness whom he wished to impeach with character evidence under Rule 608 Fed.R. Evid. and evidence of convictions under Rule 609 Fed.R.Evid. We find no error in this regard.

James Louis was an important witness for the government. Not only was he the complaining witness for counts thirteen, fourteen and fifteen, but also he was the only witness to testify about Dennis's contacts with other victims. He testified that Dennis talked about having a gun and that he had seen Dennis with a gun. He was the only borrower who kept written records of his loan transactions. On direct examination, the prosecutor brought out two felony convictions, including one twenty-two year old conviction, and one instance of employment as a paid informant for the Drug Enforcement Agency. Dennis claims that, once the prosecutor opened the subject of Louis's background on direct, Dennis should have been allowed to develop the full background by a wide-ranging cross-examination.

■■■■ Where the testimony of one witness is critical to the government's case, the defendant has a right to attack that witness's credibility by a wide-ranging cross-examination. *United States v. Dickens*, 417 F.2d 958, 959 (8th Cir. 1969) (pre-Federal Rules of Evidence). The Federal Rules of Evidence, however, place certain limitations on such impeachment. Under Rule 608(b), the court in its discretion may allow impeachment of a witness by cross-examination concerning specific instances of conduct not resulting in conviction if the conduct relates to the witness's character for truthfulness or untruthfulness. The court balances a question's relevance to honesty

and veracity with its prejudicial impact. *United States v. Hastings*, 577 F.2d 38, 40–42 (8th Cir. 1978); *United States v. Young*, 567 F.2d 799, 803 (8th Cir. 1977), *cert. denied*, 434 U.S. 1079, 98 S.Ct. 1273, 55 L.Ed.2d 706 (1978). Rule 609(a) provides that in a criminal case the prior conviction of a prosecution witness may be used to impeach his credibility if it (1) was a felony and the court in its discretion determines that its probative value outweighs its prejudicial effect, or (2) involved dishonesty or false statement. Rule 609(b) limits evidence of convictions to those within ten years or with special probative value. For a discussion of the legislative history of Fed.R.Evid. 609 see *United States v. Hastings, supra,* 577 F.2d at 41, and *United States v. Thorne*, 547 F.2d 56, 58–59 (8th Cir. 1976).

■■■■ The court rejected Dennis's attempts to put in four types of evidence for impeachment. First, Dennis wanted to cross-examine Louis about convictions that ranged from twenty-six to thirty-five years old. All of the offenses were remote in time, older even than the twenty-two year old conviction brought out on direct; and none of the convictions related to offenses that were especially probative of truthfulness. Therefore, the trial court did not abuse its discretion in rejecting them under Rule 609. Second, Dennis wanted to cross-examine Louis about an arrest for tax problems, which did not result in a conviction. Although cross-examination about arrests without convictions is precluded, Rule 608(b) would permit inquiry into the specific acts that may have led to the arrest if those acts related to *crimen falsi, e. g.,* perjury, subornation of perjury, false statement, embezzlement, false pretenses. *United States v. Kirk*, 496 F.2d 947 (8th Cir. 1974). The trial court did not err in precluding evidence of the arrest for tax problems, because civil tax problems cannot be regarded as indicating a lack of truthfulness under this standard. Third, Dennis wanted to cross-examine Louis extensively about his activities as a paid informant. Dennis was permitted to question Louis

about his being paid as an informant for the Drug Enforcement Agency but was barred from asking about the specific financial arrangements. The court's ruling noted that Louis was before the court as "a victim of extortion not as an accomplice or informant." Cross-examination about specific instances of conduct should be limited to an elicitation of the basic facts. *See Carlsen v. Javurek*, 526 F.2d 202, 210 (8th Cir. 1975). There was no error in excluding excessive and irrelevant details of Louis's acknowledged work as an informant. Fourth, Dennis wanted to question Louis about his representation by the United States Attorney in a civil lawsuit.[8] The lawsuit was a spurious $15 million "civil rights" suit brought *pro se* by a convict against the entire United States, which named Louis, among the many defendants (including the President of the United States and the district court judge in this case) because he had been a witness at the convict's trial. The United States Attorney had not represented Louis personally or exclusively in that lawsuit. There was no abuse of discretion in determining that such "representation" did not make Louis indebted to the United States Attorney or reflect on his credibility in any way.

V. State Usury Law

█ Dennis contends that the trial court gave the jury an erroneous instruction on Missouri's usury rates. The challenged instruction, based on Mo.Ann.Stat. § 408.-030, .100 (Vernon's 1978) read:

> Under Missouri law, the maximum allowable annual rate of interest for all loans is 10 per cent per year, with the exception of loans under $500, for which it is 15 per cent interest per year. That part of any agreement which provides for the payment of interest in excess of said amounts is unenforceable under Missouri law.

Dennis argues that the loans were not "unenforceable" under Missouri law because § 408.060 provides that, even where usury has been pleaded as a defense, the lender

may recover "the amount found due upon the principal debt, with legal interest, after deducting therefrom all payments of usurious interest." Legal interest is the statutory rate of 6 percent. Mo.Ann.Stat. § 408.-020 (Vernon's 1978).

Section 892(b)(1) gives as the first factor of a prima facie case, "the inability of the creditor to obtain a personal judgment against the debtor for the *full* obligation." Conf.Rep. No. 1397, 90th Cong., 2d Sess., 2 [1968] U.S.Code Cong. & Admin.News, p. 2026 (emphasis added). This is not an enforcement of state usury laws, rather the inference is that, if legal means were not available, illegal means were contemplated. *Id.* at 2027; *United States v. Natale*, 526 F.2d 1160, 1165 (2d Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). Had Dennis attempted to use legal means to enforce one of these loans, he clearly could not have enforced "the full obligation," the greater part of which was the thirteen hundred per cent interest. The instruction correctly stated that it was the excess interest which was "unenforceable." This contention is without merit.

VI. Reputation Evidence

Dennis contends either that reputation evidence should not have been admitted or, in the alternative, if reputation evidence was admissible, each count should have been severed and tried separately to prevent confusion and prejudice under Rule 403, Fed.R.Evid.

█ In loansharking cases, the use of implicit rather than explicit threats, plus the unwillingness of most victims to testify, forces the prosecution to prove the extortionate "understanding" by circumstantial evidence.

Perhaps the most devastating and significant circumstantial evidence results from the defendant's fear-inspiring character itself. The reputation of a loanshark or extortionist, or knowledge of his past criminal activities, impresses upon even the most courageous the potential

---

**8.** *National Committee for Justice, Inc. v. Carter, et al.*, 465 F.Supp. 827 (E.D.Mo. 1978).

consequences of a refusal to comply with his wishes. Nevertheless, the introduction of character evidence, even if relevant, entails a high risk of prejudice to the defendant. Therefore, courts have often viewed it unfavorably. Cases of loansharking and extortion, however, reveal great judicial latitude in admitting character evidence.

Goldstock & Coenen, *Controlling the Contemporary Loanshark : The Law of Illicit Lending & the Problem of Witness Fear*, 65 Cornell L.Rev. 196–97 (1980). The two types of character evidence most often used in loansharking cases are prior acts and reputation evidence. The trial court must balance the prejudicial effect of these types of evidence against their probative value.

 Reputation evidence is often admissible because, without it, the prosecution could not prove the extortionate "understanding." Reputation evidence may be used to show the state of mind of both the defendant and the victim.

If a man makes vaguely menacing statements, aware that he is commonly known as a violent man, then it is a reasonable inference that he intends to instill fear. If this were not his intention, we may infer that he would take special care to counteract the communication of an implied threat. It is unlikely that the defendant is unaware of his own reputation for violence; reputation, by definition, reflects general knowledge in the community, and, if anyone is a member of the relevant community, it is the defendant himself.

Reputation evidence is often used to help establish the *victim's* state of mind— as proof of his fear and the reasonableness thereof. The state may establish the existence of reasonable fear by showing the victim's knowledge of the defendant's reputation for a violent character or underworld association at the time the crime was committed; it need not show, however, a specific reputation for vio-

lence in connection with extortionate schemes.

Goldstock & Coenen, *supra*, at 200–01.

 Prior acts evidence likewise is admissible to show the victim's fear and its reasonableness. *United States v. Palmiotti*, 254 F.2d 491 (2d Cir. 1958). The prior acts may be relevant even if they are not identical to those which the victim fears. *Callanan v. United States*, 223 F.2d 171, 177–78 (8th Cir.), *cert. denied*, 350 U.S. 862, 76 S.Ct. 102, 100 L.Ed. 764 (1955). But similarity is an important consideration in determining whether the probative value outweighs the potential prejudice to the defendant.[9] *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

 Dennis argues that, regardless of probative value, reputation evidence is admissible under § 892(b)(3)(B) only if direct evidence of the victim's state of mind is unavailable. Section 892(b) sets out the elements of a prima facie case, which are summarized as follows:

(1) an extension of credit, which is unenforceable through judicial process;

(2) interest in excess of annual rate of 45 per cent;

(3) debtor's reasonable belief that either
 (A) creditor had collected by extortionate means; or
 (B) creditor had reputation for use of extortionate means;

(4) outstanding debt exceeding $100.

Section 892(c) provides:

. . . [I]f . . . direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing the *understanding* of the debtor and the creditor at the time the extension of credit was made, the court may in its discretion may allow evidence to be introduced tending to show the reputation as to collection practices of the creditor in any community of which the debtor was a

---

**9.** On the related topic of prior conduct to show the defendant's state of mind, *see generally*

Annot., 47 A.L.R.Fed. 781 § 7.

member at the time of the extension. (emphasis added)

Section 894(c) similarly allows reputation evidence to show "that words, or other means of communication, shown to have been used as a means of collection, in fact carried an express or implied *threat* . . ." (emphasis added). These ECT provisions could be read as restricting the use of character evidence to certain limited situations where direct evidence of the actual belief of the debtor is unavailable. The legislative history, however, clarifies that Congress intended reputation evidence to be before the trier of fact whenever it would be relevant to the state of mind of the parties. 2 [1968] U.S.Code Cong. & Admin.News, *supra*, at 2027. Because Congress obviously intended to facilitate proof in these cases, courts have rejected unavailability [10] as a prerequisite to the admission of reputation evidence. *See, e. g., United States v. Webb*, 463 F.2d 1324, 1327–28 (5th Cir.), *cert. denied*, 409 U.S. 986, 93 S.Ct. 338, 34 L.Ed.2d 251 (1972). In addition, § 894(c) allows evidence of prior conduct to establish that collection practices were extortionate. *United States v. Frazier*, 479 F.2d 983, 986 (2d Cir. 1973); *United States v. Curcio*, 310 F.Supp. 351, 357–58 (D.Conn. 1970).

All of the complaining witnesses, except Willie Austin and Charles Miller, testified as to the extortionate nature of their transactions with Dennis. There were no explicit agreements between Dennis and these debtors that extortionate means would be used to collect their loans. Accordingly, each of these witnesses testified to Dennis's reputation or to acts of violence which they had witnessed in his collection of debts from others. Their testimonies were the "direct" evidence of the debtor's state of mind under § 892(b)(3).

Austin and Miller were unwilling to testify about the extortionate aspects of their loans. For Miller, extortion was established through introduction of his grand jury testimony and Dennis's records, and Miller's demeanor at trial. For Austin, extortion was established through Dennis's records, Austin's own demeanor at trial and third-party evidence from James C. Louis that he had seen Dennis use violence in collecting from Austin. This is prior acts and reputation evidence admissible under § 892(c) and § 894(c).

Each piece of evidence regarding extortionate means was clearly admissible on the count for which it was offered. Dennis further contends, however, that, even if the evidence on reputation and prior acts was otherwise admissible, it should have been excluded because of its tendency to confuse the jury. Dennis recognizes that the court gave limiting instructions but says that the instructions gave the jury the "impossible task" of deciding where the evidence could be considered and where it had to be disregarded. The trial court's instructions were understandable and legally correct. The jury was properly instructed to what extent and for what purposes it could consider such evidence. Where the court determines that evidence is admissible to show a defendant's intent and state of mind, an instruction on the limited purpose of the evidence is adequate to minimize the prejudicial effect of such testimony. *United States v. Lasky*, 548 F.2d 835 (9th Cir.), *cert. denied*, 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977); *United States v. Spica*, 413 F.2d 129 (8th Cir. 1969).

Finally, then, Dennis asserts that the appropriate solution to the potential prejudice and confusion of issues would have been to sever the counts of the indictment and try each count separately. Judicial economy and legitimate public interests favor a joinder of all offenses against the accused. *United States v. Gaddis*, 418

---

10. An alternative rationale is that a debtor who is afraid or unwilling to testify is "unavailable" for purposes of § 892(c) and § 894(c). *See United States v. Spears*, 568 F.2d 799 (10th Cir. 1978); *United States v. Nakaladski*, 481 F.2d 289, 297, 299 (5th Cir. 1973). Congress recognized: "The major difficulty which confronts the prosecution of offenses of this type is the reluctance of the victims to testify. That is, if they are in genuine fear of the consequences of nonpayment, they are apt to be equally or even more in fear of the consequences of testifying as a complaining witness." 2 [1968] U.S.Code Cong. & Admin.News, *supra*, p. 2026.

F.Supp. 869 (W.D.Okla. 1976) applying Rule 14, Fed.R.Crim.P. A motion to sever is addressed to the sound discretion of the trial court. *United States v. Bohr*, 581 F.2d 1294 (8th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978); *Tribbitt v. Wainwright*, 540 F.2d 840 (5th Cir.), *cert. denied*, 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1976). Denial of severance is not a ground for reversal unless clear prejudice and abuse of discretion are shown. *United States v. Losing*, 560 F.2d 906 (8th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). A showing of prejudice resulting in denial of motion to sever requires more than a showing of a better chance of acquittal at separate trials. *United States v. Bohr, supra*, 581 F.2d 1294. Inevitably, some prejudice results from having the jury aware of evidence of one crime while considering whether the defendant is guilty of another. *United States v. Foutz*, 540 F.2d 733 (4th Cir. 1976). Evidence is not excludable under Rule 403, however, where the evidence of each crime would have been admissible on a separate trial on the other crime. *United States v. Burkley*, 591 F.2d 903 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979). Where evidence that a defendant had committed one crime would be probative and thus admissible at the defendant's separate trial for another crime, the defendant does not suffer any additional prejudice if the two crimes are tried together. *United States v. Foutz, supra*, 540 F.2d 733.

Dennis does not make a clear showing of prejudice by joinder in this action. Rule 404(b) makes evidence of other crimes admissible to show intent. Rule 404(b), Fed.R.Evid. The same result could be reached under § 892(c). *See* J. Weinstein & M. Berger, Weinstein's Evidence ¶ 405(04) (1977). Because, as discussed above, the purpose of prior acts and reputation evidence in loansharking cases is to show intent, evidence of each offense would have been admissible on the element of intent at separate trials of each other offense. *See United States v. Palmiotti, supra*, 254 F.2d at 497; *Callanan v. United States, supra*, 223 F.2d at 177–78. Dennis did not suffer any additional prejudice by having the offenses tried together. There was no abuse of discretion in denying the motion for severance.

## VII. Submissible Case

Dennis was convicted on counts three, six, seven, nine, thirteen and seventeen for extortionate extensions of credit. He was convicted on counts four, eight, fourteen, fifteen and eighteen for extortionate collections. He was convicted for obstruction of justice on count nineteen. For the reasons discussed below, Dennis contends that the government failed to make a submissible case as to any count of the indictment, and, therefore, that his conviction must be reversed and discharged.

In reviewing the sufficiency of the evidence, this court must view all the evidence in the light most favorable to the government, drawing all reasonable inferences from that evidence. *Moore v. United States*, 375 F.2d 877 (8th Cir.), *cert. denied*, 389 U.S. 844, 88 S.Ct. 92, 19 L.Ed.2d 110 (1967).

On the counts for extortionate extensions of credit, Dennis argues that the government failed to prove actual extensions of credit on or about the dates in the indictment. This contention is patently without merit. Dennis apparently concedes that the government did show the existence of a prior loan on each of those dates. Also, each witness testified to the following understanding with Dennis. At the end of each week the full amount of the principal plus twenty-five percent interest came due. If less than that was paid, Dennis recomputed the amount due and carried it over to the next week.

Section 891(1) provides:
To extend credit means to make or renew a loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

The statutory definition is broad on its face. Courts have read it so as to include the broadest possible range of transactions and agreements. *See, e. g., United States v. Bufalino*, 576 F.2d 446 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978); *United States v. Totaro*, 550 F.2d 957 (4th Cir.), *cert. denied*, 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977); *United States v. Briola*, 465 F.2d 1018 (10th Cir. 1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973). There is no need, however, to test the statutory language here, for the described actions were clearly agreements whereby the repayments of debts were deferred. There was proof of extensions of credit on or about the dates in the indictment.

On the counts for extortionate extensions of credit, Dennis argues that there was no evidence of extortionate understanding. On the extortionate collection counts, he argues that there was no proof of extortionate means. He bases both arguments on the denial by several witnesses of any fear on their parts.

Section 891(6) requires proof that there was an "understanding of the creditor and debtor at the time [of the transaction] . . . that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means . . ." This element of the offense goes to the state of mind of both parties. The term "understanding" as the trial court instructed the jury here, means "comprehension" or awareness. *United States v. Benedetto*, 558 F.2d 171, 177–78 (3d Cir. 1977); *United States v. DeVincent*, 546 F.2d 452, 456 (1st Cir. 1976), *cert. denied*, 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977); *United States v. Annoreno*, 460 F.2d 1303, 1308–09 (7th Cir.), *cert. denied*, 409 U.S. 852, 93 S.Ct. 64, 34 L.Ed.2d 95 (1972). Fear is not an element of the offense. *United States v. Natale, supra*, 526 F.2d at 1168; *but see United States v. Nace*, 561 F.2d 763, 768 (9th Cir. 1977). Neither does the statute require proof of express threats. *United States v. Annoreno, supra*, 460 F.2d at 1309. Rather, Congress provided special evidentiary provisions which allow the prosecutor to show this understanding by circumstantial evidence. First, as a part of the prima facie case, the state may show the debtor's reasonable belief that the creditor had used or had a reputation for using "extortionate means" of collections. 18 U.S.C. § 892(b). Second, if direct evidence of this sort is "unavailable," the court may allow evidence to show the creditor's reputation as to collection practices. 18 U.S.C. § 892(c). It is well established that even with outright denials of threats or fear, the jury may infer from other testimony and other evidence that the extortionate understanding existed. *United States v. DeLutro, supra*, 435 F.2d at 256; *United States v. Nakaladski, supra*, 481 F.2d 289; *United States v. Spears, supra*, 568 F.2d 799. As discussed above, there was evidence that each debtor knew of Dennis's reputation for the use of violence in collection; and it follows that each was aware of the possibility that violence or unlawful means could be used to enforce collection of his debt. This same reputation evidence may be used to infer Dennis's intent to cause that awareness. 18 U.S.C. § 894(a); *United States v. Martorano*, 557 F.2d 1, 8 n.3 (1st Cir. 1977); *United States v. Sears*, 544 F.2d 585 (2d Cir. 1976). Therefore, there was sufficient evidence of extortionate understanding in the extension of credit to put before the jury.

Further, any collection on extensions of credit that the collector knows were extortionate when made constitutes an extortionate collection, because the collector intends that the borrower feels pressured by the possibility of violence. *United States v. Nakaladski*, 481 F.2d at 298. Therefore, there was sufficient evidence of extortionate means of collection.

On the counts for extortionate collection, Dennis argues that there was no proof of collections on or about the dates in the indictment. Suffice it to say that collection was proved by Dennis's own records, Louis's records, cashed checks from the victims and the testimony of the victims.

On the obstruction of justice count, Dennis argues that all of his conversations

with Hughes related to the FBI investigation [11] rather than to his grand jury appearance. The basis for this disingenuous assertion is that Hughes never told Dennis that the grand jury had subpoenaed him. This fact is strangely out of context. Hughes testified that he did not have to tell Dennis about the subpoena because Dennis already knew about it and that Dennis specifically told him to lie to the grand jury. There is no merit in this contention.

The trial court did not err in submitting the case to the jury or in denying Dennis's motion for a directed verdict of acquittal.

Accordingly, the judgment of the district court is affirmed.

---

11. False statements to the FBI do not constitute obstruction of justice. *United States v. Fayer*, 573 F.2d 741, 745 (2d Cir. 1978); *United States v. Ryan*, 455 F.2d 728, 733 (9th Cir. 1972).